UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VANCE EVERETT THUMM,<br><br>                    Petitioner,<br><br>       v.<br><br>JOSH TEWALT,<br><br>                    Respondent. | Case No. 1:19-cv-00389-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus, filed by Vance Everett Thumm ("Petitioner" or "Thumm"), challenging Petitioner's Ada County conviction of aggravated battery with a persistent violator sentencing enhancement. *See* Dkt. 1. The Court previously dismissed, as procedurally defaulted, Claims 1, 2, 4(b), 7(a), 7(b), 7(e), 8(b), 10, 11(a), and 12. *See* Dkt. 30. The remaining claims in the Petition are now fully briefed and ripe for adjudication.

The Court takes judicial notice of the records from Petitioner's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

For the reasons explained below, the Court enters the following Order denying habeas corpus relief.

## BACKGROUND

The following facts of Petitioner's case, as described by the Idaho Supreme Court, are presumed correct, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

Several people attended "an early morning party in a motel room rented by Thumm." *Thumm v. State*, 447 P.3d 853, 859 (Idaho 2019) (*Thumm II*). When Thumm rented the room, he used his own name and was in the view of a security camera.

The revelers included Petitioner himself, Paris Davis (Petitioner's girlfriend), Frankie Hughes, and victim Deven Ohls, along with several others. *Id*. During the party, Petitioner and Hughes attacked Ohls, with Hughes later admitting that he stabbed Ohls in the buttock. "After the prolonged attack, Ohls suffered significant bleeding, a concussion, two black eyes, a complex laceration to the lip, a fractured nose, and the stab wound." *Id*.

Petitioner was charged with aggravated battery, along with a persistent violator enhancement. *See* Idaho Code §§ 18-907, 19-2514. Three others were also charged. "Following a motion by the State, Thumm's case was joined with that of Hughes and Davis, though Thumm was ultimately tried in a joint trial with only Davis." *Thumm II*, 447 P.3d at 259 (Idaho 2019).

The victim, Deven Ohls, testified that Petitioner did not participate in the attack and that Ohls did not remember even seeing Petitioner in the room. *State's Lodging A-10* at 515–16. However, other witnesses testified that Petitioner was present and did, in fact, participate in the attack.

Specifically, Steinmetz testified that he saw Petitioner punching Ohls. *State's Lodging A-11* at 695. Steinmetz stated that Petitioner later told him, "don't say nothing." *Id.* at 763. Hughes testified that Petitioner struck Ohls with an Olde English 800 Malt Liquor bottle and a Budweiser bottle. *Thumm II*, 447 P.3d at 871.

The jury found Petitioner guilty after a four-day trial. *Id.* at 859. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. *State v. Thumm*, 285 P.3d 348, 360 (Idaho Ct. App. 2012) (*Thumm I*); *State's Lodging B-8*.

Petitioner also filed a state petition for post-conviction relief, which the trial court summarily dismissed. *State's Lodging C-1* at 348–93. The Idaho Supreme Court affirmed. *Thumm II*, 447 P.3d at 874.

Petitioner then filed the instant habeas corpus petition. The following claims remain for adjudication on the merits:

Claim 3:     Petitioner's Fifth Amendment right was violated when the state introduced evidence, and mentioned in closing argument, that Petitioner invoked his right to remain silent.

Claim 4:     Petitioner was denied his constitutional right to a fair trial due to the serious and relentless acts of prosecutorial misconduct, in the following respects: (a) appealing to the jury's passions and prejudices; and (c) eliciting evidence that Petitioner invoked his right to remain silent. (Claim 4(b) was previously dismissed.)

Claim 5:     Cumulative error based on Claims 3 and 4 (except sub-claim 4(b)[1]).

---

[1] Petitioner initially asserted cumulative error based on Claim 1 through 4. However, because Claims 1, 2, and 4(b) have been dismissed as procedurally defaulted, the errors alleged in those claims cannot be considered in analyzing Petitioner's cumulative error claim. *See, e.g., Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 916 (10th Cir. 2019) ("Cuesta-Rodriguez's ineffective-assistance claims, having been ruled procedurally barred, have no place in our cumulative-error analysis."); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) ("[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather

Claim 6:      Ineffective assistance of counsel, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984), in the following respects: (a) trial counsel's conduct regarding joinder and severance of the trial with co-defendants; (b) trial counsel's failure to object to the hearsay statements of Petitioner's co-defendant being introduced in Petitioner's trial; and (c) appellate counsel's failure to raise the joinder issue as fundamental error on direct appeal.

Claim 7:      Ineffective assistance of trial counsel, based on lack of preparation, in the following respects: (c) failing to timely file a motion to suppress photo line-ups; and (d) failing to adequately meet, communicate, or prepare with Petitioner and failing to provide and/or review the discovery with him. (Claims 7(a), (b) and (e) were previously dismissed.)

Claim 8:      Ineffective assistance of trial counsel in the following respects: (a) failing to oppose the proposed impeachment of witnesses by gang membership; (c) failing to object to testimony of Jeremy Steinmetz and failing to impeach him; (d) failing to object to the prosecution's use of the term "prison"; (e) failing to use certain fingerprint evidence; (f) failing to object to prosecutorial misconduct; (g) failing to impeach Frankie Hughes as biased; and (h) failing to impeach, refresh, or follow up with testifying detectives. (Claim 8(b) was previously dismissed).

Claim 9:      Violation of *Brady v. Maryland*, 373 U.S. 83 (1963), based on the state's failure to timely disclose a fingerprint report.

Claim 11:     (b) Ineffective assistance of direct appeal counsel for failing to raise claims of (i) an alleged Confrontation Clause violation, under *Bruton v. United States*, 391 U.S. 123 (1968); (ii) gang membership-related impeachment, as discussed in *United States v. Abel*, 469 U.S. 45 (1984); (iii) the alleged *Brady* violation; and (iv) all instances of prosecutorial misconduct. (Claim 11(a) was previously dismissed).

*See Memo. Dec. and Order*, Dkt. 30, at 3–4; *Pet.*, Dkt. 1, at 8–17.

Respondent argues that all of these claims must be denied on the merits. Respondent

---

than mere violations of state law; (2) *the errors were not procedurally defaulted for habeas purposes*; and (3) the errors "so infected the entire trial that the resulting conviction violates due process.") (emphasis added) (internal quotation marks omitted).

also argues that Claims 4(a), 5, and 8(f) must be dismissed as procedurally defaulted.

For the reasons that follow, the Court concludes that Claims 4(a), Claim 5, and Claim 8(f) are not procedurally defaulted. The Court also concludes that all of Petitioner's remaining claims fail on the merits.

## DISCUSSION

### 1.    Claims 4(a), 5, and 8(f) Are Not Procedurally Defaulted

The Court has previously explained the standards of law governing exhaustion and procedural default and will repeat them here only as necessary to explain this decision.

Respondent argues that the state court rejected Claims 4(a) and 5 on adequate and independent state procedural grounds and that Petitioner never raised Claim 8(f) to the state courts. The Court disagrees.

Claim 4(a) alleges prosecutorial misconduct based on the prosecutor's closing argument that the jury should "picture themselves in the position of the victim." *Pet*. at 9. The Idaho Court of Appeals rejected this claim under Idaho's fundamental error doctrine. This Court has already held that Idaho's fundamental error doctrine is a merits-based doctrine. *Grove v. Carlin*, No. 3:17-cv-00306-CWD (D. Idaho April 28, 2020), *cert. of appealability denied* (9th Cir. Oct. 1, 2020). Respondent's attempts to distinguish *Grove* are unpersuasive.

Claim 5 asserts cumulative error based on the claims raised in Petitioner's direct appeal. Once again, the Idaho Court of Appeals relied on the fundamental error doctrine in rejecting this claim. Pursuant to *Grove*, this was a merits-based decision, and Claim 5—at least with respect to the errors alleged in Claims 3 and 4 (except 4(b))—is not procedurally

defaulted.[2]

Claim 8(f) alleges that Petitioner's trial counsel was ineffective for failing to object to prosecutorial misconduct. Respondent argues that, on appeal from the dismissal of his post-conviction petition, Petitioner did not include enough argument on this issue to have fairly presented it. Dkt. 33 at 15–16. The Court disagrees.

Petitioner argued in his opening appellate brief that the results in the direct appeal would have been different if had counsel objected to "all of the … complaints about the state's closing argument [in addition] to the three actually argued," because in that event the harmless error standard—rather than the fundamental error standard—would have applied. *State's Lodging D-1* at 40. This argument plainly refers to prosecutorial misconduct during closing argument and—although brief—was sufficient to fairly present the claim to the Idaho Supreme Court. *See Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *as amended*, 247 F.3d 904 (9th Cir. 2001) (holding that a federal claim has been exhausted in state court if "the petitioner both raised the claim in state court and explicitly indicated then that the claim was a federal one.") (emphasis omitted). Therefore, Claim 8(f) is not procedurally defaulted.

The Court now proceeds to analyze the merits of Petitioner's remaining claims.

**2.      Standards of Law for Review of Habeas Claims on the Merits**

A federal court may grant habeas corpus relief when it determines that the petitioner

---

[2] Respondent is correct that Claims 1, 2, and 4(b) cannot be considered in the context of Claim 5's assertion of cumulative error. *See* n.1, *supra*. Thus, and only to that extent, those portions of Claim 5 are also procedurally defaulted. However, the remaining portion of Claim 5—cumulative error based on Claims 3 and 4 (except Claim 4(b))—is not.

"is in custody in violation of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is

further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty

Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief must be denied unless the

state court's adjudication of the petitioner's claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The term "unreasonable" in § 2254(d) is reserved for "extreme malfunctions in the

state criminal justice system," not for "ordinary error" or even for cases "where the

petitioner offers a strong case for relief." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per

curiam) (internal quotation marks omitted). Accordingly, a federal court reviewing a state

court's adjudication of a claim on the merits "must carefully consider all the reasons and

evidence supporting the state court's decision." *Id*. Courts are not permitted "to essentially

evaluate the merits *de novo* by omitting inconvenient details from its analysis." *Id*. (internal

quotation marks and alteration omitted). Instead, "[d]eciding whether a state court's

decision involved an unreasonable application of federal law or was based on an

unreasonable determination of fact requires the federal habeas court to train its attention

on the particular reasons—both legal and factual—why state courts rejected a state

prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks and citations omitted).

Deference is required under § 2254(d) even if the highest state court denied the petitioner's claim without expressly addressing it. In such a case, the Court must "'look through' the unexplained decision to the last related state-court decision that ... provide[s] a relevant rationale." *Id*. at 1192. The Court then presumes that "the unexplained decision adopted the same reasoning." This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." *Id.*

If there is no reasoning provided by any state court, the Court presumes that the state court adjudicated all fairly presented claims on the merits unless there is some "indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). This presumption also applies if a state court addresses some, but not all, of a petitioner's claims. *Johnson v. Williams*, 568 U.S. 289, 298 (2013). When a court applies the presumption, it must "conduct an independent review of the record to determine what arguments or theories could have supported the state court's decision"; the court must then determine whether fair-minded jurists "could disagree that those arguments or theories are inconsistent with the holding in a decision of the Supreme Court." *Bemore v. Chappell*, 788 F.3d 1151, 1161 (9th Cir. 2015) (internal quotation marks and alterations omitted); *see also Rowland v. Chappell*, 876 F.3d 1174, 1181 (9th Cir. 2017) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by

which we can determine whether a silent state court decision is objectively unreasonable." (internal quotation marks and citation omitted)).

When a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis omitted).

The AEDPA standard is extremely high, and a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong. Rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Williams*, 529 U.S. at 411. If there is *any* possibility that fair-minded jurists could disagree on the correctness of the state court's

decision, § 2254(d)(1) precludes relief. *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013); *Richter*, 562 U.S. at 101–02. In other words, if one fair-minded jurist could agree that the state court's decision is reasonable, habeas relief must be denied—even other fair-minded jurists would disagree.

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of the United States Supreme Court, as of the time the state court rendered its decision. *Williams*, 529 U.S. at 412. The habeas statute does not require an *identical* factual pattern before a legal rule must be applied. Rather, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *See White*, 572 U.S. at 427.

On the other hand, if a court must *extend* a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state court's decision. *Id*. at 407. A federal habeas court "may not overrule a state court for … holding a view different from its own" when the precedent from the Supreme Court "is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). Although circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent, *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000), a federal court may not use circuit law to refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific legal rule that the Supreme Court itself has not announced, *Lopez v. Smith*, 574 U.S. 1, 7 (2014).

If no Supreme Court decision has confronted the specific question presented by a state prisoner's federal habeas petition—that is, if the circumstances of a petitioner's case

are only generally similar to the Supreme Court's precedents—then the state court's decision cannot be "contrary to" any holding from the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). By the same token, a state court cannot unreasonably apply established federal law that does not exist. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, if (1) a claim was adjudicated on the merits in state court, and (2) the underlying factual determinations of the state court were not unreasonable, then evidence that was not presented to the state court cannot be introduced on federal habeas review. *See Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Instead, state court factual findings are presumed to be correct and are binding on the

federal court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019) (holding that § 2254(e)(1) "appears to apply to all factual determinations made by state courts"). "If reasonable minds reviewing the record might disagree about the finding in question," the finding is not unreasonable under § 2254(d)(2). *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019) (internal quotation marks and alterations omitted).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to or an unreasonable application of Supreme Court precedent under subsection (d)(1), or by establishing the state court's decision was based on an unreasonable factual finding under subsection (d)(2)—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision.[3] *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), as modified by *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021).[4]

Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness

---

[3] De novo review is also required where the state appellate court did not decide a properly-asserted claim or where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

[4] In *Edwards*, the Supreme Court held that *Teague*'s exception to non-retroactivity for watershed rules of criminal procedure is no longer good law. 141 S. Ct. at 1560.

found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002); *Kirkpatrick*, 926 F.3d at 1170 ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits [by a state court]."). Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply.[5] *See Murray*, 745 F.3d at 1000.

Generally, even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). A "reasonable possibility" of prejudice is insufficient. *Brecht*, 507 U.S. at 637.

Because § 2254(d) applies to harmlessness determinations of state courts, a federal court on habeas review cannot find an error prejudicial based solely on the *Brecht* standard. Rather, "[w]hen a state court has ruled on the merits of a state prisoner's claim [by finding the error harmless], a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v.*

---

[5] Section 2254(e)(2) prohibits new evidence in federal habeas proceedings except in narrow circumstances not applicable here.

*Davenport*, 142 S. Ct. 1510, 1517 (2022).[6] That is, if the state court determined that an error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967), that harmlessness decision is also subject to AEDPA's deferential standard of review.

Additionally, some types of claims "are analyzed under their own harmless error standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). *Brady* and *Strickland* claims are included in this category. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (stating that, once a court has found a *Brady* error, "it cannot subsequently be found harmless under *Brecht*"); *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel …, we apply *Strickland*'s prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

## 3.     Petitioner Is Not Entitled to Habeas Relief on Claim 3

In Claim 3, Petitioner alleges that, during its case-in-chief, the prosecution violated Petitioner's Fifth Amendment right to remain silent by eliciting testimony that Petitioner had invoked that right. Claim 3 also alleges the prosecution improperly commented to the jury that Petitioner left the crime scene, rather than staying and telling the police what happened; Petitioner contends that this statement constituted an adverse comment on his pre-*Miranda* silence.

---

[6] In *Brown*, the United States Supreme Court explained that if the habeas court concludes that an error was harmful under *Brecht*, the petitioner must also satisfy the AEDPA standard to prevail; but if the habeas court concludes that an error was *not* harmful under *Brecht*, then the inquiry ends, and there is no need for an additional AEPDA inquiry. 142 S. Ct. at 1528.

### A.    Factual Basis of Claim 3

Officer Holland testified during the state's case-in-chief. The prosecutor and Officer

Holland engaged in the following exchange regarding Thumm's arrest:

> Q.    What, if anything, did [Thumm] say in response to your statements about the warrant? Did he say anything at all?
>
> A.    I don't recall. We didn't have much conversation in regards to the fact that he was being arrested on the warrant.
>
> Q.    Okay. What, if anything, did he do to acknowledge whether or not he had heard you?
>
> A.    *He invoked his rights a couple times stating I got right*s.
>
> Q.    *And let me interrupt you*. I guess, what I'm asking you though is, did he at any point in time ask you what the warrant was for himself or ask for clarification on the warrant?
>
> A.    I don't recall if he did. I remember him knowing that he was instructed what the warrant was.

*State's Lodging A-11* at 1020–21 (emphasis added).

During closing argument, the defense relied on Petitioner's behavior before the

attack to assert that Petitioner had acted like someone with nothing to hide:

> [Thumm] went into this motel room. Rented the room in his own name. We put the receipt into evidence. He wasn't trying to hide it. He walked right in there on a security camera. He didn't have any plan for this to happen. He just wanted to have fun for the night.

*Id*. at 1161.

During rebuttal closing argument, the prosecutor relied on Petitioner's flight after

the attack, among other things, as evidence of Petitioner's guilt. During the course of that

argument, the prosecutor mentioned that Petitioner did not speak to police but, instead, left

MEMORANDUM DECISION AND ORDER - 15

the scene before they arrived:

> What other objective evidence [is there]? The other objective is why would [Thumm] leave? That hotel room is in his name[.] [I]f he did nothing wrong[,] [i]f he is not going to get busted because the cops are coming because he committed this crime, why would you leave? He left because he knew exactly what he did.
>
> The police arrived within four minutes. Where was [Thumm]? Gone. Lickety-split. He is out. Because he ain't getting caught. But if he didn't do anything wrong, if you truly left and weren't even in the hotel room [when the attack occurred], … wouldn't you be going, hey, what happened? What's going on? No, that doesn't happen. He's gone. And he gets arrested, he gets arrested four days later.
>
> Why run if you're not guilty? *Why not stick around and tell police what happened?* Why get rid of clothes if it's not evidence? The clothes never show up. See, this is objective evidence, you know what, nobody is putting a spin on this, but it is telling you exactly who to believe.
>
> Jeremy and Frankie both say [Thumm] rented the room. That's corroborated. Jeremy and Frankie say [Thumm] was in the room. That's corroborated. [Thumm] was on the surveillance video. Remember Deven [the victim] said [Thumm] was never there. So how are you going to believe that? How are you going to put your whole case in Deven Ohls?

*Id*. at 1175–76 (emphasis added).

### B.   *Clearly Established Law*

The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person … shall be compelled in any criminal case to be a witness against himself." Every criminal defendant has a right not to testify, and the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 616 (1965).

MEMORANDUM DECISION AND ORDER - 16

Not every comment relating to the right not to testify violates the Fifth Amendment, however. The Fifth Amendment is "concerned only with *adverse* comment, whether by the prosecutor or the trial judge." *Lakeside v. Oregon*, 435 U.S. 333, 338 (1978). Neutral comments, such as an instruction by the court that the jury may not infer guilt from a defendant's silence, do not offend the Constitution. *Id*. Further, a prosecutor's comments on a defendant's choice not to testify do not violate the Fifth Amendment if those comments constitute fair argument offered in response to a defense claim that the defendant did not have a chance to tell his side of the story. *United States v. Robinson*, 485 U.S. 25, 31–32 (1988).

In *Robinson*, the defendant did not testify at trial. During closing argument, defense counsel argued that the government had breached its "duty to be fair" and had not allowed the defendant to explain himself. *Id.* at 27 n.2. The prosecutor then told the jury, "[Defense counsel] has made comments to the extent the Government has not allowed the defendant[] an opportunity to explain. It is totally unacceptable…. He could have taken the stand and explained it to you, anything he wanted to. The [prosecution] has given him, throughout, the opportunity to explain." *Id.* at 28. The Supreme Court held that the prosecutor's statements, taken in the context in which they were made, did not violate the defendant's Fifth Amendment right to be free from compelled self-incrimination. *Id.* at 31. That is, the Fifth Amendment does not "prohibit [a] prosecutor from fairly responding to an argument of the defendant by adverting to [the accused's] silence." *Id.* at 34.

**C.**   ***The State Court's Rejection of Claim 3 Was Not Unreasonable under AEDPA***

On direct appeal, the Idaho Court of Appeals concluded that Petitioner's Fifth Amendment right to remain silent was not violated. With respect to the prosecutor's questioning of Officer Holland, the court found, as a factual matter, that the prosecutor "was not attempting to elicit information regarding Thumm's pre-*Miranda* silence." *Thumm I*, 285 P.3d at 356. Instead, the officer's statement regarding Thumm's rights "was merely an unsolicited 'blurt.'" *Id*. The court further noted it was not clear that the jury actually would have implied guilt from the neutral statement that Thumm invoked his rights. Finally, the court held that, even if there had been a violation of Petitioner's right to remain silent based on Holland's testimony, any such error was not prejudicial "given the totality of the testimony and evidence at trial." *Id*.

The state appellate court held that the prosecutor's closing rebuttal comments about Petitioner's silence also did not violate Thumm's right to remain silent. Taken in context, the statement about Petitioner's failure to stay at the scene and talk to the police was merely "a passing reference" that the prosecutor made "while discussing Thumm's immediate flight from the crime scene." *Id*. at 359. Because there was evidence that Thumm had fled from the scene, and because evidence of flight is relevant to prove consciousness of guilt, the court held "there was nothing improper about the prosecutor using that evidence to imply Thumm's consciousness of guilt." *Id*.

The court of appeals' rejection of Claim 3 was a reasonable application of federal law. A fair-minded jurist could conclude that the officer's testimony was not an adverse

MEMORANDUM DECISION AND ORDER - 18

comment on the invocation of Petitioner's right. *See Lakeside v. Oregon*, 435 U.S. at 338. Such a jurist also could conclude that any error was not prejudicial. In addition, the comment was a fair response to defense counsel's closing argument that Petitioner's behavior *before* the attack showed he was not intending to do anything untoward. The prosecutor's use of Petitioner's behavior *after* the attack to imply consciousness of guilt fairly responded to the defense's closing argument. In the prosecutor's description of what Petitioner did after the attack, the passing reference to not sticking around to tell the police what happened simply does not rise to the level of a Fifth Amendment violation.

### 4. Petitioner Is Not Entitled to Relief on the Remaining Portions of Claim 4

#### A. *Factual Basis of Claims 4(a) and 4(c)*

In closing argument, the prosecutor invited the jury to imagine themselves in the victim's position:

> So imagine you're Deven Ohls. You pick up your girlfriend to go [to] the bar. You have a few drinks. You pick up another friend that you know. You go to a hotel for an after party. You go to drink alcohol. You go to hang out with friends. While you're there, you notice you're one and they seem to be four. While you are there things appear okay. Things start to get a little bit hot maybe. All of a sudden out of the blue you're standing, there's one behind you. Two in front of you. You can feel it coming. And sure enough it does. And Vance Thumm takes the first blow.

*State's Lodging A-11* at 1087–88. Claim 4(a) asserts that this argument constituted misconduct because it improperly appealed to the jury's passions and prejudices.

Claim 4(c) asserts prosecutorial misconduct in eliciting Officer Holland's testimony, quoted above, that Petitioner invoked his right to remain silent. The factual basis

of this sub-claim is identical to that described above with respect to Claim 3.

### A.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment guarantees the right to a fair trial, and prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). However, prosecutorial misconduct will warrant habeas relief only if it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

A court must consider the record as a whole when making such a determination, because a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context. *See United States v. Young*, 470 U.S. 1, 16–17 (1985); *Darden*, 477 U.S. at 182 (applying *Young*); *see also Donnelly*, 416 U.S. at 647–48 (distinguishing between "ordinary trial error of a prosecutor" and the type of "egregious misconduct . . . [that] amount[s] to the denial of constitutional due process"). The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

A prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury." *Darden*, 477 U.S. at 192 (internal quotation marks omitted). However, a prosecutor's closing argument, "billed in advance to the jury as a matter of opinion not of evidence," is "seldom carefully constructed" and may contain "[i]solated

passages" that are "less than crystal clear." *Donnelly*, 416 U.S. at 646–47.

Prosecutors are allowed "to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996). For example, "in a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1194 (9th Cir. 2015) (internal quotation marks and alterations omitted). A court must not "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Id*. at 647. A prosecutor's argument "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's [improper argument] would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 12.

When reviewing prosecutorial misconduct claims under the "unreasonable application" prong of § 2254(d)(1), the Court must keep in mind that the prosecutorial misconduct standard is a "very general one" that affords state courts "leeway in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (internal quotation marks and alterations omitted).

### B.   The State Court's Rejection of Claims 4(a) and 4(c) Was Not Unreasonable under AEDPA

With respect to Claim 4(a), the Idaho Court of Appeals held that the prosecutor's

discussion of being in the victim's position "may have been improper." *Thumm I*, 285 P.3d at 358. Under Idaho's fundamental error framework, however, the court held that any error in the prosecutor's comments was not clear and obvious. Even assuming the prosecutor's comments were improper, the court concluded that the error was harmless beyond a reasonable doubt:

> By closing arguments, the jury had already been exposed to graphic descriptions and photographs depicting the attack on Deven Ohls, and had heard descriptions of the attack from several witnesses. We are confident beyond a reasonable doubt that the jury, having heard and observed all such evidence, would have convicted Thumm absent the prosecutor's comments.

*Id*.

This was a reasonable application of the *Chapman* harmless error standard. And, even without the state court's harmlessness analysis, this Court would conclude that Petitioner has not established actual prejudice under *Brecht*. This Court agrees with the court of appeals that

> the prosecutor's comments in this case invited the jury to put themselves in the position of Deven Ohls, more so as a descriptive technique than as an appeal to the jury's emotions. The statement did not ask the jury to convict out of fear or protection of society.

*Thumm I*, 285 P.3d at 358. There is simply nothing in the record to suggest that the prosecutor's invitation for the jury to imagine themselves as the victim had a substantial and injurious effect on the verdict.

As for Claim 4(c), the Idaho Court of Appeals found that the prosecutor did not intend for Officer Holland to discuss Petitioner's invocation of his right to remain silent.

*Thumm I*, 285 P.3d at 356. Nothing in the record rebuts this finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Also, it was not clear that the jury would have interpreted the reference to Petitioner's invocation as an implication of guilt. *Id*. Finally, the state appellate court held that any error was not prejudicial, given the totality of the circumstances.

The state court's analysis of prosecutorial misconduct in the context of Officer Holland's testimony was not unreasonable. Just as a fair-minded jurist could conclude that Holland's statement about the invocation was not adverse, so could a fair-minded jurist conclude that the prosecutor did not commit misconduct in asking the preceding questions. Indeed, the transcript shows that the prosecutor stopped Holland from speaking the instant he mentioned the invocation. The state court reasonably determined that the prosecutor did not commit misconduct in questioning Holland, and the state court's prejudice determination was also reasonable, given the strength of the other trial evidence. Therefore, the Court must deny Claim 4 on the merits.

**5.      Petitioner Is Not Entitled to Habeas Relief on Claim 5**

Claim 5 asserts cumulative error based on the constitutional violations alleged in Claims 3, 4(a), and 4(c). Under the cumulative error doctrine, "a collection of errors" can violate a criminal defendant's constitutional rights even if each individual error, by itself, would not arise to a constitutional violation. *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004). That is, for the cumulative error doctrine to apply, a petitioner must assert more than one constitutional error.

As explained above, the Idaho Court of Appeals reasonably held that no error

occurred with respect to Officer Holland's testimony or the prosecutor's comments during closing argument with respect to Petitioner's flight from the scene (Claims 3 and 4(c)). The court did conclude that the prosecutor might have improperly appealed to the jury's emotions (Claim 4(a)). *See Thumm I*, 285 P.3d at 358. However, because there was only one potential constitutional violation within Claims 3, 4(a), and 4(c), there are no other errors to cumulate. Thus, the Court must deny Claim 5.

**6.    Petitioner Is Not Entitled to Habeas Relief on Claim 9**

In Claim 9, Petitioner claims that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to timely disclose a fingerprint report.

### A.    *Factual Basis of Claim 9*

After the disclosure deadline had passed and in the week prior to trial, the state disclosed a fingerprint report to the defense. The state had only recently received the report from the crime lab. *State's Lodging A-11* at 750–51.

This report was a mixed bag for Petitioner. It indicated that Petitioner's fingerprint was found on a bottle of Jose Cuervo tequila found in the motel room, which would have called into question the victim's statement that Petitioner was not in the room. But the report also found that Petitioner was *excluded* as the source of fingerprints found on a Budweiser bottle, broken pieces of a second Jose Cuervo bottle, and an unopened bottle of Olde English Malt Liquor. *State's Lodging C-1* at 181–83, 202–03.

Petitioner's counsel argued that, because of the late disclosure, the prosecution should be precluded from introducing the fingerprint report. The state and the trial court agreed. *State's Lodging A-11* at 750–51.

At trial, Hughes testified that "Thumm struck the victim with an Olde English 800 Malt Liquor bottle and a Budweiser bottle." *Thumm II*, 447 P.3d at 871. The Idaho Supreme Court noted that this trial testimony referenced "bottles seemingly similar to those on which Thumm was excluded as a source of recovered prints." *Id*. The fingerprint report, which might have cast some doubt on Hughes's testimony on this point, was not introduced at trial by either party. *State's Lodging A-11* at 750–51.

### B.    Clearly Established Law

Under the Due Process Clause of the Fourteenth Amendment, the prosecution has a duty to disclose evidence favorable to the defense that is material to guilt or punishment, regardless of whether the defense has requested such evidence. *Brady*, 373 U.S. at 87; *United States v. Bagley*, 473 U.S. 667, 676 (1985). A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The duty to disclose favorable evidence applies "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). It applies not only to the prosecutor but also to the prosecution's agents, such as police officers. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding that impeachment evidence known only to the police, but unknown to the prosecutor, was subject to *Brady* disclosure). Thus, "the individual prosecutor has a duty

*to learn* of any favorable evidence known to the others acting on the government's behalf in the case." *Id*. (emphasis added).

Favorable evidence can be exculpatory or impeaching. Exculpatory evidence is evidence tending to show the defendant did not commit the crime, while impeachment evidence is information that might help in conducting a cross-examination. *Bagley*, 473 U.S. at 677.

Undisclosed evidence is material under *Brady*, and its non-disclosure is prejudicial, if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. Exculpatory or impeaching evidence need not be evidence that would have produced an acquittal. *Kyles*, 514 U.S. at 434. Rather, the undisclosed evidence need only be such that, "if disclosed and used effectively, it may [have made] the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676.

### C.    *The State Court's Rejection of Claim 9 Was Not Unreasonable under AEDPA*

The Idaho Supreme Court held that the prosecution's untimely disclosure of the fingerprint report did not violate *Brady* for two reasons. First, the court held that, because the state provided the report to the defense "at the same time" the prosecution received the report from the crime lab, the state did not suppress that report. *Thumm II*, 447 P.3d at 872.

Second, the court held that the report would not "have swung the tide in [Petitioner's] favor"—that is, the report was not material under *Brady*. *Id*. The bottles were

never part of the state's theory of the case. Instead, Petitioner was charged with stomping, punching, and hitting the victim, or aiding and abetting others in doing so. *Id.* Although Hughes had testified that Petitioner also used bottles to assault Ohls, there was no showing "that a more-timely disclosure of the report would have allowed [defense counsel] to cross-examine Hughes in such a way [as] to make a difference in the outcome." *Id.*

The Idaho Supreme Court's decision was not unreasonable. The court found, as a factual matter, that the prosecution disclosed the fingerprint report to the defense as soon as they received it. Petitioner has not rebutted this finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Thus, the state court reasonably determined that the report was not suppressed.

The state court's determination that the fingerprint report was not material is also reasonable. The bottles were an insignificant part of the evidence against Petitioner, and the lack of Petitioner's fingerprints on some of the bottles at the scene does not mean Petitioner did not participate in the attack. The fingerprint report was not inconsistent with the prosecution's theory of the case, and Petitioner has not shown materiality under *Brady*.

Finally, the United States Supreme Court has never applied *Brady* to information or documents that were disclosed to the defense before (or even during) trial. *See Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) ("The Supreme Court has never expressly held that evidence that is turned over to the defense during trial has been 'suppressed' within the meaning of *Brady*."). Rather, the Supreme Court's *Brady* jurisprudence has, to date, involved information that was *withheld*, not information that was disclosed to the defense before trial. Because no clearly established Supreme Court precedent has applied

*Brady* to information disclosed before trial, AEDPA precludes relief on Claim 9.

**7.    Petitioner Is Not Entitled to Habeas Relief on His Remaining Claims of Ineffective Assistance of Counsel (Claims 6, 7, 8, and 11)**

### *A.    Clearly Established Law*

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to the effective assistance of counsel in his defense. The Supreme Court explained the standard for ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel ("IAC") must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient performance and prejudice to prove an IAC claim. *Id.* at 697. On habeas review, a court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one prong is not satisfied and would compel denial of the claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness.   *Id.* at 687–88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

> reconstruct the circumstances of counsel's challenged conduct,
> and to evaluate the conduct from counsel's perspective at the
> time. Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable
> professional assistance; that is, the defendant must overcome
> the presumption that, under the circumstances, the challenged
> action might be considered sound trial strategy. There are
> countless ways to provide effective assistance in any given
> case. Even the best criminal defense attorneys would not
> defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id*. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation
> are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision that
> makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690-91. That is, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

The Ninth Circuit has provided some insight into the *Strickland* standard when

evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether a state court reasonably applied *Strickland*. *See Duhaime*, 200 F.3d at 600.

First, tactical decisions do not constitute IAC simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Third, "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017).

If a petitioner shows that counsel's performance was deficient, he must also show that the deficient performance caused prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As *Strickland* instructs:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings

> as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695–96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

These principles from *Strickland* also apply to claims of ineffective assistance of direct appeal counsel. Effective legal assistance does *not* mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983). "Nothing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client." *Id.* at 754. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751–52. Consequently, although it is "possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a particular claim, … it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

A petitioner can show deficient performance of appellate counsel only when counsel failed to raise a nonfrivolous issue that "was clearly stronger than [the] issues that counsel did present." *Id.* That is, a petitioner must show that his appellate attorney failed to raise an issue obvious from the trial record that probably would have resulted in reversal of the conviction. *Turner v. Duncan*, 158 F.3d 449, 459 (9th Cir. 1998), *as amended on denial of*

*reh'g* (Nov. 24, 1998); *Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would probably have resulted in reversal, then he cannot satisfy either prong of *Strickland*—appellate counsel's performance was not deficient for failing to raise such an issue, and petitioner suffered no prejudice as a result of it not having been raised. *Id.* at 1435.

The foregoing standards, which give deference to trial and appellate counsel's decision-making, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to federal courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101 (internal quotation marks and citation omitted). That is, when evaluating an IAC claim under § 2254(d), this Court's review of that claim must be "doubly deferential." *Pinholster*, 563 U.S. at 190 (internal quotation marks omitted). Because *Strickland* itself "is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "the more general the rule, the more leeway state courts have" in deciding constitutional claims. *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam) (internal quotation marks omitted).

### A.    Claims 6(a), (b), and (c): IAC Based on Joinder with Co-Defendant Davis and Davis's Out-of-Court Statements

Petitioner's initial attorney, a public defender, did not oppose the state's pretrial motion to join Petitioner's case with Davis's case. (Davis's counsel did, however.) The trial court granted the state's motion for joinder. After the cases were joined and Petitioner retained private counsel, his new lawyer did not move to sever the cases. Additionally, Petitioner's direct appeal counsel did not raise the joinder issue on appeal.

Claims 6(a) and 6(c) allege that trial and appellate counsel rendered ineffective assistance because, if the cases had been severed, then certain out-of-court statements made by Davis would have been inadmissible hearsay in Petitioner's trial. Claim 6(b) claims that counsel should have objected at trial to the admission of Davis's out-of-court statements, both as inadmissible hearsay and under the Confrontation Clause of the Sixth Amendment.

The Idaho Supreme Court described the statements as follows:

> Two witnesses at trial, Jeremy Steinmetz and … Frankie Hughes, testified that directly after the attack in the hotel room, co-defendant Davis told Thumm he was "going to prison." Steinmetz also testified that a few minutes later, Davis was "still freaking out" and told both Hughes and Thumm to burn the clothing they were wearing because it could be used as evidence against them.

*Thumm II*, 447 P.3d at 862.

The Idaho Supreme Court held that joinder was proper, under Idaho Criminal Rules

8 and 14, so that any motion to sever the cases would have been denied. The court also held that, even if the trials had been severed, Davis's statements would have been admissible against Petitioner under the excited utterance exception to Idaho's rule against hearsay. *See* Idaho Rule of Evidence 803(2). Thus, the state court concluded, Petitioner failed to demonstrate prejudice with respect to the joinder and hearsay issue. *Thumm II*, 447 P.3d at 863.

The state court's rejection of Claim 6 was not unreasonable. This Court must defer to the Idaho Supreme Court's application of state law and state procedural rules, such as the Idaho Criminal Rules and the Idaho Rules of Evidence. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Therefore, because joinder was proper under state law, and because Davis's statements would have been admissible against Petitioner as a hearsay exception—even if his trial had been severed—trial counsel were not ineffective with respect to the joinder and hearsay issue. For the same reason, direct appeal counsel did not render ineffective assistance with respect to that issue because any such argument would have failed on appeal. *See Miller*, 882 F.2d at 1435.

However, Petitioner argues that counsel should have objected to the statements not only on hearsay grounds, but also based on *Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* held that the Confrontation Clause prohibits the admission, against a non-testifying defendant, of a *co*-defendant's out-of-court statement if that statement inculpates the non-testifying defendant. *Id*. at 126–27, 137.

Relying solely on its hearsay analysis, the Idaho Supreme Court declined to decide

whether defense counsel was ineffective for failing to raise the *Bruton* issue. *Thumm II*, 447 P. 3d at 863–64. Thus, the Court considers this portion of Claim 6 de novo and concludes that defense counsel did not render ineffective assistance.

*Bruton* was issued long before the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), the case that governs the modern interpretation of the Confrontation Clause. Under *Crawford*, the Confrontation Clause applies only to *testimonial* out-of-court statements. *Id*. at 68.

The boundaries of *Crawford*'s testimonial evidence limitation are defined by the "primary purpose" test. In *Ohio v. Clark*, the Supreme Court held that whether a statement is testimonial does not depend on "whether a jury would view the statement as the equivalent of in-court testimony." 576 U.S. 237, 250 (2015). Instead, the test is "whether a statement was given with the primary purpose of creating an out-of-court substitute for trial testimony." *Id*. at 251 (internal quotation marks omitted). In other words, if the primary purpose of the statement was to assist in the defendant's prosecution, it is testimonial. If the statement was made for a different purpose, it is not testimonial.[7]

In particular, testimonial statements include the following: (1) statements made in prior testimony; (2) "[s]tatements taken by police officers in the course of interrogations";

---

[7] For example, in *Lucero v. Holland*, 902 F.3d 979 (9th Cir. 2018), prison officials found a small note in an inmate's sock implicating Lucero in the battery of another inmate. The note provided "a full factual accounting of the events" and was intended as an administrative record to be passed among gang leaders, but it happened to be intercepted by an investigator. *Id*. at 990. The court found that the note was not testimonial, because there was no evidence the note "was intended, as a primary purpose or otherwise, to impact a trial or other criminal proceeding through, for example, a district attorney, defense attorney, police, other witnesses, or any other person even possibly connected to the potential criminal proceedings." *Id*. at 989–90 (internal quotation marks omitted).

(3) "formalized" statements, for example, affidavits, depositions, and confessions; (4) "pretrial statements that declarants would reasonably expect to be used prosecutorially"; and (5) "statements that were made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Id*. at 51–52 (internal quotation marks omitted).

Here, Davis's out-of-court statements were not made for the primary purpose of investigation or prosecution. Thus, the statements were not testimonial, and their admission did not violate the Confrontation Clause. Consequently, defense counsel did not perform deficiently by failing to make a Confrontation Clause objection, and Petitioner cannot show prejudice in any event. The Court will deny Claim 6 on de novo review.

### B.    Claim 7(c): IAC based on Photo Lineups

In Claim 7(c), Petitioner asserts that trial counsel failed to file a timely motion to suppress certain photo lineups. Trial counsel, who had been only recently retained, filed such a motion late in the pretrial process. Instead of ruling on the motion, the trial court told defense counsel that she should make her objection at trial, when the state moved to admit the lineups. *State's Lodging A-10* at 30–31.

When the state did so, defense counsel objected. *Id*. at 292–96. The trial court overruled the objection, but not because counsel's motion or objection had been untimely. Instead, the court considered the objection on the merits and determined that the issues raised by defense counsel went to the weight of the exhibits, not to their admissibility. *Id*. at 296–97.

Based on defense counsel's objection to the photo lineups and the trial court's

decision on the merits of that objection, the Idaho Supreme Court concluded that Petitioner's counsel "was aware of this issue and took appropriate procedural steps to address it." 447 P.3d at 865. Therefore, Petitioner had failed to establish deficient performance.

This was a reasonable application of *Strickland*. Defense counsel recognized the issue with the photo lineups, made a timely and appropriate objection, and obtained a ruling on the merits. Accordingly, Claim 7(c) must be denied for failure to establish the first prong of *Strickland*.

### C.      Claim 7(d): IAC based on Lack of Communication or Sharing Discovery

Before trial, counsel stipulated to a protective order that prohibited defense counsel from sharing the fingerprint report with Petitioner. Claim 7(d) asserts IAC with respect to that stipulation.

The Idaho Supreme Court held that, although counsel "likely should have shared the report" with Petitioner, there was no prejudice from the failure to do so. *Thumm II*, 447 P.3d at 416–17. The court rested its analysis on the fact that the bottles were not part of the charging document and on "the strength of other evidence against" Petitioner. *Id*. at 417. Among other evidence, numerous witnesses familiar with Petitioner identified him as participating in the attack. Applying AEDPA's deferential standard of review, this Court cannot say the state court's decision was objectively unreasonable.

### D.      Claim 8(a): IAC based on Proposed Impeachment on Gang Membership

There was evidence, prior to trial, that Petitioner, Davis, and another person were "either members or associates of the Severely Violent Criminals prison street gang."

*Thumm II*, 447 P.3d at 867. The trial court ruled that evidence of a witness's membership or association with a gang "would only be admissible to impeach on credibility and the possibility that it could show a common scheme, plan, or identity for the reason the attack may have ensued." *Id*. Defense counsel did not object to this pretrial ruling and conceded that gang association evidence could be used for impeachment.

Defense counsel later raised a similar issue with respect to two additional potential defense witnesses: Ariel Carpenter and Chris Smith. Counsel was concerned that, if she called Carpenter to testify, the prosecution would argue gang association. Additionally, although Smith was a gang member, he was not a member of the particular gang at issue (the Severely Violent Criminals). *State's Lodging A-11* at 941–42.

The trial court ruled that calling a witness with a gang affiliation "open[s] the door under *United States v. Abel*[,] and the prosecution [thereafter] in impeaching that witness has the right to bring up that affiliation and bring up that philosophy [that the gang will cover for each other] in terms of gang membership." *Id*. at 942. *Abel* is a federal case, applying the Federal Rules of Evidence, holding that gang membership or association can be used to impeach defense witnesses.[8] 469 U.S. 45 (1984).

With the trial court's ruling that gang association can be used as impeachment, defense counsel had a choice to make—if she called Carpenter or Smith, they would be subject to impeachment based on their gang membership or association. The court did not issue a definitive ruling, but said it would have to decide whether the impeachment was

---

[8] As such, *Abel* does not bind state courts interpreting their own evidentiary rules. However, many state courts have adopted *Abel*-style rules for impeachment on gang association, including Idaho.

permissible based on the evidence presented. Defense counsel did not call Carpenter or Smith to testify.

Petitioner contends counsel should have argued that *Abel* did not apply to Carpenter or Smith because Carpenter was not a gang member at all and because Smith, while a gang member, did not belong to the same gang as Petitioner. *See* Dkt. 37 at ECF p.79–80. The Idaho Supreme Court offered several reasons for rejecting Claim 8(a): (1) "the trial court properly determined that the State could impeach witnesses who were in any gang with evidence of their membership," such that the *Abel* analysis was not limited to members of the same gang; (2) Petitioner did not submit affidavits from Smith and Carpenter, or any other evidence, as to what the witnesses' testimony would be; and (3) Petitioner failed to show that the witnesses' testimony "would have affected the outcome of the trial." *Thumm II*, 447 P.3d at 868 (emphasis added). Thus, the court denied Petitioner's IAC claim on this issue.

The state court's decision was not unreasonable. It was reasonable to conclude, under Idaho law, that evidence of gang *association*—in addition to gang *membership*—is admissible for impeachment purposes. This Court is bound by that interpretation of the Idaho Rules of Evidence. *See Estelle*, 502 U.S. at 67–68. Additionally, because there is no evidence of what either witness would say, the Idaho Supreme Court's prejudice determination was also reasonable. The Court must deny Claim 8(a).

### E.     Claim 8(c): IAC based on Testimony, and Lack of Impeachment, of Jeremy Steinmetz

In Claim 8(c), Petitioner contends that defense counsel should have objected to the

admission of Petitioner's statement to Steinmetz, a few days after the attack, along the lines of "don't say anything." Petitioner also asserts IAC based on counsel's failure to impeach Steinmetz with evidence regarding Steinmetz's initial failure to identify Petitioner in a photo lineup.

i.    Petitioner's instruction to Steinmetz not to say anything

Before trial, the state notified Petitioner and the court that it intended to introduce, through Steinmetz, a statement by Petitioner that several days after the fight, Petitioner told Steinmetz, "Don't say anything." *State's Lodging A-10* at 36. Defense counsel objected. The court stated it would not rule on the issue until the evidence was presented at trial: "At first blush, it would appear to be overly prejudicial [under Idaho Rule of Evidence 403]. But I can't do a balancing test unless I know all the facts." *Id*. at 39.

At trial, the prosecutor raised the issue before asking Steinmetz about the statement. Defense counsel did not renew her objection, and the trial court ruled the statement admissible. *State's Lodging A-11* at 748–49. Steinmetz testified that, a few days after the incident, Petitioner instructed Steinmetz not to say anything. *Id*. at 762–63.

Petitioner contends that defense counsel should have renewed her objection to the statement at trial. However, the Idaho Supreme Court found that counsel "preserved her objection … by stating her objection at the outset of trial." *Thumm II*, 447 P.3d at 865. The court noted that failure to remind the court of her previous objection "could be ineffective … but it could also have simply been a matter of strategy. Given the highly deferential nature of our review of counsel's decisions and conduct of the trial, we find no deficiencies in [counsel's] performance as to this evidence." *Id*. at 866. Important to the court's rejection

of this portion of Claim 8(c) was that Thumm provided no evidence that defense counsel's decision—to "not object repeatedly to Steinmetz's testimony that Thumm told him, 'Don't say nothing,'"—was deficient. *Id*.

Based on the record that was before the Idaho Supreme Court, this Court must consider the claim with double deference—first, to counsel's decision-making (that is, counsel's strategy) and second, to the Idaho Supreme Court's analysis. *Strickland* requires that the Court "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689 (internal quotation marks omitted). Petitioner has not overcome that presumption, and the Court must therefore deny this portion of Claim 8(c).[9]

### ii.    Steinmetz's failure to identify Petitioner in photo lineup

At the preliminary hearing, Steinmetz said he did not identify Petitioner because he was trying to protect him. *State's Lodging A-4* at 21. Steinmetz also denied that he felt "threatened, intimidated[,] or harassed in any way" by Petitioner. *Id*. at 36.

However, at trial, Steinmetz testified that the reason he did not identify Petitioner in the lineup was because he was "kind of scared of" Petitioner. *State's Lodging A-11* at 794. Petitioner claims that counsel should have been more aggressive in cross-examining Steinmetz, so as to point out the inconsistencies in Steinmetz's proffered reasons for not

---

[9] Petitioner has not raised a stand-alone claim that, when the state renewed its intention to introduce the evidence in context, the trial court erred and should have omitted the evidence based on counsel's earlier and still-standing objection.

initially identifying Petitioner.

The Idaho Supreme Court held that defense counsel performed competently with respect to the lineup issue. Because counsel used the preliminary hearing transcript to cross-examine Steinmetz on a different issue, the state court held that her failure to bring up Steinmetz's conflicting statements was strategic. "[B]ecause of the uncertainty of Steinmetz's response" to such questioning, counsel's decision not to "delve into specifics about Steinmetz's fear" of Petitioner was reasonable. *Thumm II*, 447 P.3d at 866. It was entirely possible that, had counsel sought to impeach Steinmetz with his earlier statement about his motivation, Steinmetz could have "renewed his earlier claim that he was too afraid of Thumm to identify him previously," which would have made Petitioner seem all the more dangerous. *Id*.

Once again, this Court applies the double deference standard to counsel's tactical decision not to impeach Steinmetz with his preliminary hearing testimony about the lineup. Having done so, the Court cannot say that the Idaho Supreme Court's rejection of this portion of Claim 8(c) was unreasonable.

### F.    Claim 8(d): IAC based on Davis's Use of the Word "Prison"

During a pretrial hearing, defense counsel argued that the trial court should exclude Davis's statement that Petitioner was going to "prison." The basis for the objection was that Davis was not a legal expert, and her opinion that Petitioner's actions would result in incarceration was, therefore, not relevant. *State's Lodging A-10* at 32–33. The court overruled the objection and stated that, though the prosecution could not use the phrase "going *back* to prison," a "[m]ere statement[] that somebody feels somebody is going to

go to jail or prison … I don't think [is] overly prejudicial." *Id*. at 35–36.

At trial, before the statement was introduced, the prosecutor requested that the court allow him to ask questions about Davis's statement in a leading manner, so as to avoid the prejudicial phrase "*back* to prison." *State's Lodging A-11* at 742–43. Petitioner's counsel objected to the request to ask leading questions but did not specifically renew her objection to the use of the word "prison." *Id*. at 743. The court permitted leading questions on this issue and confirmed that the prosecutor could use the phrase "going to prison," but could not use the phrase "going *back* to prison."

Claim 8(d) alleges that defense counsel should have renewed her relevance objection to Davis's statement that Petitioner was going to prison. Petitioner contends that the statement prejudiced him "because one cannot go to 'prison' for a misdemeanor." Dkt. 37 at ECF p. 88. That is, Petitioner claims that Davis's statement informed the jury that she believed Petitioner committed a felony. *Id*. at ECF p.89.

The Idaho Supreme Court held that Petitioner had failed to satisfy either prong of *Strickland* with respect to this claim:

> [C]ounsel objected to this statement and the court tried to mitigate the risk of its admission being too prejudicial by ensuring the statement did not get misconstrued as, "you're going *back* to prison." This brief reference to "prison" was not prejudicial enough to overwhelm all the admissible evidence and it cannot be said to have contributed to the verdict in any meaningful way. There is no evidence that had the objection been made, it would have been sustained, since as discussed above, the statement was admissible as an excited utterance. As a result, Thumm fails to show that [counsel's] performance was deficient or that he was prejudiced thereby.

*Thumm II*, 447 P.3d at 867.

The state court reasonably applied *Strickland* in determining that the use of the term "prison" did not meaningfully contribute to the verdict and, therefore, could not have prejudiced Petitioner.[10] Given the multiple witnesses to Petitioner's participation in the attack and the severe injuries the victim suffered, there is little chance that the verdict would have been different without Davis's statement. Thus, Claim 8(d) must be denied.

### G.    Claim 8(e): IAC based on the Fingerprint Report

In Claim 8(e), Petitioner alleges IAC based on defense counsel's failure to use the fingerprint report in his defense. As explained above with respect to Claim 9, the Idaho Supreme Court reasonably held that the report was not material under *Brady*, because, although the report excluded Petitioner's fingerprints from liquor bottles at the scene, Petitioner was charged only with stomping, punching, and hitting the victim, or aiding and abetting others in doing so—he was not charged with using weapons, such as the bottles, to attack Ohls. It is well-established that "*Brady* materiality and *Strickland* prejudice are the same." *Gentry v. Sinclair*, 705 F.3d 884, 906 (9th Cir. 2013) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985). That is, "if the information … does not constitute a *Brady* violation for lack of materiality, it will likewise not support an ineffective assistance claim." *Id*. Claim 8(e), therefore, necessarily fails.[11]

---

[10] Because the state court's prejudice analysis was reasonable, the Court need not consider that court's analysis of the deficient performance prong of *Strickland*.

[11] To the extent that Petitioner wanted counsel to cross-examine Hughes with the information that Petitioner's fingerprints were not found on the Olde English bottle to rebut Hughes's testimony that Petitioner used that bottle to assault Ohls, the Idaho Supreme Court determined that Petitioner made no showing "that a more-timely disclosure of the report would have allowed [defense counsel] to cross-examine Hughes in such a way [as] to make a difference in the outcome." *Thumm II*, 447 P.3d at 872. This Court agrees that, because the criminal charges were not centered on the victim being hit with bottles,

### H.     Claim 8(f): IAC based on Failure to Object to All Alleged Instances of Prosecutorial Misconduct

Claim 8(f) asserts that Petitioner's counsel was ineffective to failing to object to various instances of prosecutorial misconduct, primarily in closing argument. Specifically, Petitioner alleges that the prosecutor (i) "made disparaging remarks about defense counsel and [the] defense"; (ii) "made unsupported comments about the victim Deven Ohls being afraid of petitioner and because of that [Ohls] committed perjury"; (iii) "improperly argued … that Jeremy Steinmetz was afraid of petitioner"; (iv) "mischaracterized significant evidence" by stating that Hughes had "admitted to the attack while on the witness stand"; and (v) "used inflammatory words while arguing petitioner was part of the fight." Dkt. 37 at ECF p.97. Petitioner also claims his attorney should have objected to the instances of prosecutorial misconduct that he raised in his opening brief on direct appeal: (vi) appealing to the passions and prejudices of the jury; (vii) misstating the reasonable doubt standard; and (viii) eliciting Holland's testimony about Petitioner invoking his rights. *Id*. at ECF p.98.

### iii.     The Prosecutor's Rebuttal Closing Argument

Because a full understanding of the prosecutor's rebuttal closing argument is necessary for the consideration of Claim 8(f), the Court will quote that argument at length.

While having the words "NO DEFENSE" before the jury in a power point presentation, defense counsel stated:

---

counsel had extremely wide latitude with the subject matter chosen for cross-examination, and Petitioner has not shown any prejudice from the selected cross-examination material.

You know, it's interesting when you don't have a defense, there's certain things that happen. Okay? There's certain techniques that are used. Let me go through some of these techniques. You create a smoke cloud. Ask an octopus if that works. Okay. You put the police on trial to deflect attention from your actions.

Remember in opening statements, [defense counsel] told you she was going to talk to you about the police actions in the case. Remember that? Well, that's moved a little bit. That's changed a little bit. But what happens is just as [defense counsel] says, hey, if Frankie is pointing the finger, there is a reason why he is pointing the finger; right? If the Defense is putting the police on trial there's a reason why they are putting the police on trial. You pull a red herring, you cross the trail to divert to other issues that aren't even there. Other details that are not elements. And lastly, you present a moving target and you change. If you don't have a defense, that's pretty common.

*State's Lodging A-11* at 1169–70.

The prosecutor also made the following argument about the victim's testimony, in which Ohls said he could not identify his attacker:

Why do you think in court [Ohls] won't identify the attacker? Think about that. Why do you think he won't identify Paris [Davis]? They're still friends. [Ohls has] been around a little bit. Why do you think he doesn't identify [Thumm]?

…

Protecting [Davis]. Yeah, they're still friends. Scared of [Thumm]. Yeah, he won't ID. [Ohls] won't ID [Thumm].… Yeah, he is going to say that because that … takes care of [Thumm] and [Thumm] isn't going to be riding him anymore. See how that works?

…

[Ohls] is minimizing because he is scared and it tells you that [Thumm] is guilty of aggravated battery.

*Id*. at 1176, 1179, 1181.

MEMORANDUM DECISION AND ORDER - 46

The prosecutor argued that Steinmetz was also afraid of Petitioner:

> [Steinmetz] is a 22-year-old timid young man because if you notice his testimony, he wouldn't even look at [Thumm]. He cowared [sic] from [Thumm] because he knows what [Thumm] can do.

*Id*. at 1178–79.

Finally, the prosecutor described Petitioner as the kind of person who would not run from a fight:

> What's the characteristics of an alpha male? Think about this generally. In control, likes to control, doesn't let go of control. Sees himself as the center. Makes the decisions. Expects others to follow him and back him up. Doesn't like outsiders. Won't turn rail and run.
>
> Let me talk about that for a second. If you think this fight broke out and [Thumm] decided, hey, let's go, I'm out of here. Really? Do you think [Thumm] ran away when the fight began if he wasn't involved in starting it? Do you think he just let it go? Do you think he just said, hey, see you boys; you're my boys, but I'm out. Uh-huh, he doesn't turn tail and run. No alpha male does that. And he won't let a kill go without tasting the blood.

*Id*. at 1183–84.

    iv.    <u>The Rejection of Claim 8(f) Was Not Unreasonable.</u>

The Court presumes that the Idaho Supreme Court denied Claim 8(f) on the merits, even though that court did not expressly address the claim.[12] *See Johnson v. Williams*, 568 U.S. at 298. Therefore, the Court must apply AEDPA's deferential standard of review by

---

[12] The Idaho Supreme Court did expressly consider a stand-alone prosecutorial misconduct claim, finding five alleged instances of misconduct procedurally defaulted (for failure to raise them on direct appeal) and one instance for which no prejudice was shown. *Thumm II*, 447 P.3d at 872–74. These same facts are those underlying the IAC claims, but the Idaho Supreme Court did not separately address the IAC claims, which require additional elements to prove.

determining the theories upon which the state court could have relied and considering whether fair-minded jurists could have accepted those theories. *See Bemore*, 788 F.3d at 1161.

A reasonable jurist could have concluded that most of the prosecutor's arguments in rebuttal closing, though unquestionably "hard blows," were reasonable inferences drawn from the evidence put forth at trial. *See Ceja*, 97 F.3d at 1253. To the extent any of the prosecutor's comments can be said to have crossed the line from acceptable argument and into the realm of the improper, there is no evidence to suggest that counsel's decision not to object was unreasonable.

There are numerous reasons not to object during closing argument—chief among them, to avoid calling the jury's attention to the very comment alleged to be objectionable. Indeed, "many lawyers refrain from objecting during … closing argument." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993), *as amended on denial of reh'g* (Apr. 15, 1993). Therefore, "absent egregious misstatements, the failure to object during closing argument … is within the 'wide range' of permissible professional legal conduct." *Id*. (quoting Strickland, 466 U.S. at 689).

A fair-minded jurist could conclude that counsel made a reasonable strategic decision not to object to the prosecutor's comments. The comments challenged by Petitioner were not egregious misstatements to which a competent attorney would feel compelled to object. A fair-minded jurist could also conclude that counsel's failure to object during the prosecutor's rebuttal closing was not prejudicial. The evidence against Petitioner was strong, and Petitioner simply has not shown a reasonable probability that,

had defense counsel objected during rebuttal closing argument, the verdict would have been different. Thus, the Court must deny Claim 8(f).

### I.      Claim 8(g): IAC based on Impeachment of Frankie Hughes

One disputed issue at trial was that Hughes was biased and had a motive to lie. Claim 8(g) asserts that defense counsel did not sufficiently cross-examine Hughes about his motive to lie. Petitioner's counsel elicited testimony that police officers had told Hughes he could get probation if he cooperated with law enforcement. *State's Lodging A-11* at 912. Holland confirmed he told Hughes that Hughes "probably ha[d] a good chance" at receiving probation. *Id*. at 1157. Hughes also acknowledged he was still facing serious charges for his role in the attack. *Id*. at 915. Finally, in closing argument, Petitioner's attorney noted that Hughes had "a lot to gain by testifying and pointing the finger" at Petitioner. *Id*. at 1157.

Petitioner contends that counsel should have impeached Hughes specifically with evidence of the length of the prison sentence he was facing. The Idaho Supreme Court rejected this claim because Petitioner could not show prejudice. Although defense counsel "did not specifically ask [Hughes] about a 30-year prison sentence, the jury was aware of the potential for prison and that [Hughes] had a strong motivation to shift blame to Thumm for the incident." *Thumm II*, 447 P.3d at 866. The court also approved the lower post-conviction court's factual finding that counsel's decision not to ask about the length of Hughes's potential prison sentence was tactical, as well as its conclusion that this tactical decision was "not based on any shortcomings capable of objective review." *Id*. at 867.

The state court's rejection of Claim 8(g) on both prongs of *Strickland* was not

unreasonable under AEDPA. The jury knew that Hughes was facing charges of aggravated battery. They also knew that Hughes had been informed by investigators that he could get probation if he cooperated. Petitioner simply has not shown a reasonable probability that knowledge of the specific maximum prison sentence Hughes was facing would have changed the outcome of the jury's verdict. Nor has Petitioner shown that counsel's decision as to precisely how to question Hughes was unreasonable.

### J.     Claim 8(h): IAC based on Failure to Impeach, Refresh, or Follow up with Testifying Detectives about Photo Lineups

In Claim 8(h), Petitioner asserts that his trial counsel should have recalled, impeached, or refreshed the recollections of Detective Leavitt and Officer Holland. The critical point Petitioner wanted to highlight is that "a lineup was, in fact, presented to Ohls and his girlfriend, Everhart[,] and both failed to identify Thumm." *Thumm II*, 447 P.3d at 869. Petitioner wanted counsel to recall Leavitt or refresh his memory about whether Detective Holland had shown Ohls and Everhart (another witness to the attack) a photo lineup. Petitioner also wanted counsel to discuss the lineup with Holland, but she "failed to re-examine whether a lineup was shown to a witness a second time." *Id*. Counsel also did not follow-up with Leavitt about whether he lied to Hughes about having Hughes' fingerprints on a bottle that could connect him with hitting Everhart, when, in fact, the fingerprint report had not yet been generated. *Id*.

The Idaho Supreme Court held that counsel's performance in this area was not deficient. The court presumed, as it was required to do under *Strickland*, that counsel's choices "of whom to call as a witness and the manner of questioning to be performed" were

reasonable strategic decisions. *Thumm II*, 447 P.3d at 869. The court also concluded that Petitioner could not show prejudice. Thus, the court held, Petitioner had not rebutted the "strong presumption of effective assistance." *Id*.

This was a reasonable application of *Strickland*. Petitioner has not submitted any evidence to support a conclusion that defense counsel made objectively unreasonable decisions with respect to the calling and questioning of the law enforcement witnesses. There was not much defense counsel could do to call into question Petitioner's identity, given that those present who knew him implicated him in the crime. The record reflects that the cross-examination subject matter defense counsel chose to address with the detectives was adequate and appropriate to the chosen defense theory. Thus, AEDPA precludes relief on Claim 8(h).

### K.  Claim 11(b): IAC based on Direct Appeal Counsel's Failure to Raise the Bruton, Abel, Brady, and Prosecutorial Misconduct Issues

On direct appeal, Petitioner's appellate counsel did not argue that Davis's out-of-court statements (discussed above with respect to Claim 3) violated the Confrontation Clause under *Bruton*. Nor did appellate counsel assert a *Brady* claim. And, although appellate counsel raised certain claims of prosecutorial misconduct, counsel did not challenge the other alleged instances of prosecutorial misconduct as set forth in Claim 8(f), above. Claim 11(b) asserts that appellate counsel failed to raise these issues, as well as the *Abel* issue of potential impeachment based on gang affiliation. The Idaho Supreme Court held that appellate counsel was not ineffective for failing to raise any of these issues on direct appeal.

First, the state court found that appellate counsel *did* raise the *Abel* issue, and the court adjudicated it on direct appeal, a finding that is supported by counsel's briefing on direct appeal and by the decision of the Idaho Court of Appeals. *See State's Lodging B-2*; *B-4*; *Thumm I*, 285 P.3d at 354–55. Second, because the *Brady* claim was appropriately considered—and rejected—in post-conviction proceedings, there was no prejudice from direct appeal counsel's failure to raise the issue earlier. These are reasonable factual findings and reasonable applications of *Strickland*.

Though the Idaho Supreme Court did not address whether direct appeal counsel should have raised the *Bruton* issue, this Court holds, on de novo review, that Davis's statements were not testimonial and, thus, their admission did not violate the Confrontation Clause. It necessarily follows that appellate counsel did not render ineffective assistance by failing to raise the issue.

Finally, the Idaho Supreme Court determined that direct appeal counsel's failure to argue all alleged instances of prosecutorial misconduct did not amount to ineffective assistance. Direct appeal counsel did raise three prosecutorial misconduct claims: (1) appealing to the passions and prejudices of the jury, (2) misstating the reasonable doubt standard, and (3) using Petitioner's silence to imply guilt. The court found that appellate counsel's choice to raise these three claims, but not the other potential misconduct claims, was "a tactical or strategic decision to winnow what may have appeared to be weaker issues." *Thumm II*, 447 P.3d at 870. The court held that Petitioner had not shown deficient performance, nor had he shown prejudice from counsel's decision regarding which claims to raise on direct appeal.

MEMORANDUM DECISION AND ORDER - 52

The state court's rejection of Claim 11(b) was not unreasonable under AEDPA. Direct appeal counsel competently decided which issues to raise on appeal. Moreover, Petitioner has not established prejudice—he has not shown that any claim not raised probably would have resulted in reversal of the conviction. Accordingly, the Court must deny Claim 11(b).

## CONCLUSION

For the foregoing reasons, the Court must deny Petitioner's remaining habeas claims on the merits.

## ORDER

**IT IS ORDERED:**

1.    The remaining claims in the Petition for Writ of Habeas Corpus are DENIED, and this entire action is DISMISSED with prejudice.

2.    The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

DATED: March 1, 2023

David C. Nye
Chief U.S. District Court Judge